# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| G&D FURNITURE HOLDINGS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SUNTRUST BANK,<br><br>Defendant. | Civil Action No. TDC-16-2020 |

## MEMORANDUM OPINION

Plaintiff G&D Furniture Holdings, Inc. ("G&D") has filed this civil action against Defendant SunTrust Bank ("SunTrust"), seeking the return of funds that G&D alleges were wrongfully withdrawn from its account to satisfy a writ of garnishment to a third party. Now pending before the Court are the parties' Cross Motions for Summary Judgment. On March 4, 2019, the Court held a hearing on the Motions and issued a partial ruling on the record, which narrowed the issues to be resolved to the single question of whether SunTrust breached its contractual duty of care owed to G&D when it allegedly failed to return the full amount of garnished funds. For the reasons set forth below, SunTrust's Motion will be GRANTED, and G&D's Motion will be DENIED on this issue.

## BACKGROUND

The Court set forth the facts of this case in its two prior memorandum opinions, which it incorporates by reference here. *See G&D Furniture Holdings, Inc. v. SunTrust Bank*, No. TDC-16-2020, 2017 WL 2963350, at *1-2 (D. Md. July 11, 2017); *G&D Furniture Holdings, Inc. v. SunTrust Bank*, No. TDC-16-2020, 2016 WL 7441607, at *1 (D. Md. Dec. 22, 2016). At the

March 4, 2019 hearing on the pending Cross Motions for Summary Judgment and SunTrust's Motion to Appoint a Special Master, the Court granted summary judgment to SunTrust on G&D's conversion claim and its breach of contract claim based on SunTrust's April 12, 2013 tender to the Circuit Court for Fairfax County, Virginia ("the Virginia Court") of $133,656.69 of garnished funds. It took under advisement G&D's breach of contract claim based on SunTrust's alleged failure to return the full amount of garnished funds and SunTrust's Motion to Appoint a Special Master. On March 12, 2019, the parties submitted a status report in which SunTrust, with G&D's consent, withdrew its Motion to Appoint a Special Master. The Court now addresses the single remaining issue before it.

In essence, the issue before the Court is whether Sun Trust's account statements for the G&D account with an account number ending in 61663 ("the Master Account" or "Account 61663") accurately reflected the balance in the account at the end of April 2013. If so, SunTrust returned to G&D the exact amount that it was due after the improper garnishment; if not, SunTrust owes G&D additional funds.

The parties generally agree on how the account was intended to function. On March 11, 2011, G&D, through its then-President and Chief Executive Officer Norman R. Gilden, opened the Master Account as a deposit checking account by executing a Business Account Signature Card. Later that month, G&D signed up for SunTrust's Zero Balance Account ("ZBA") service, which allows a banking client to manage its cash flow by aggregating debit and credit entries from one or more "subsidiary" accounts to a "master" account on a daily basis. Statement of Undisputed Facts ¶ 3, ECF No. 103-1. Under the ZBA arrangement, funds may flow in and out of the subsidiary accounts, but at the end of each day, the balance of all subsidiary accounts are returned to zero by having any excess funds transferred from the subsidiary account into the master account,

and having any negative balances covered by a transfer from the master account into the subsidiary account. When functioning properly, the ZBA arrangement would result in a single debit or credit entry to the subsidiary account at the end of each day, reflecting the flow of funds to or from the master account to achieve a zero balance in the subsidiary account, and a corresponding, offsetting entry would simultaneously appear on the master account's ledger. Thus, the ZBA transfers moved funds between accounts but did not alter the total amount of money collectively contained in the accounts.

When G&D requested the ZBA service, it designated Account 61663 as the master account, and linked it with seven subsidiary accounts titled in the names of related entities, including the accounts with account numbers ending in 48109, 13869, 95497, 13770, 21306, 59067, and 01019 (collectively, the "Subsidiary Accounts"). By doing so, G&D agreed that funds would be moved between the Master Account and the Subsidiary Accounts, even though the Subsidiary Accounts were not in the same name as the Master Account. Funds did, in fact, flow in this manner, apparently without objection by G&D, until March 2013.

Then, on March 5, 2013, when a garnishment summons was served, SunTrust placed holds on several of the accounts, including the Master Account, which, as described in greater detail below, caused debits to those accounts to be rejected but permitted credits to post to the accounts. Thus, funds could not be withdrawn from those accounts, but deposits into the accounts could be made. Although G&D argues that the placing of holds on these accounts and its associated effects on the accounts violated generally accepted accounting principles, G&D does not contest that the accounts operated in this fashion after the holds were placed. Nevertheless, G&D and SunTrust disagree on how the Court should interpret the account statements for the time period when the holds were in place.

## DISCUSSION

In its Motion for Summary Judgment, G&D argues that SunTrust's statements for the Master Account contain 232 unauthorized transactions that should be disregarded by the Court, and that as a result, the records establish that SunTrust continues to owe G&D $71,567.92 as reimbursement for the improper garnishment. SunTrust, on the other hand, argues in its Motion for Summary Judgment that even though certain automatic ZBA-related transactions during the time period of the garnishment holds were not authorized and thus improper, the account statements accurately reflect that the garnishment resulted in the withdrawal of more funds than were actually available. Based on an affidavit describing a thorough analysis of the relevant accounts, Sun Trust argues that the records establish that it correctly did not return to G&D $84,505 of the returned garnishment funds.

### I. Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II.  G&D's Motion

In its Motion, G&D relies on a joint affidavit by G&D's Vice President, Norman P. Gilden, and its Controller, Michael Fooksman, who assert that the SunTrust statements for the Master Account are incorrect because they "violate two critical tenets: a) in and of themselves, they violate the protocol of the zero balance account in that they do not transfer money from one account to another, b) they violate generally accepted accounting principles because assets and liabilities are not balanced." Gilden & Fooksman Aff. ¶ 2, ECF No. 100-2. Thus, G&D urges the Court to completely disregard all ZBA-related credit and debit transactions from the Master Account statements for March and April 2013, a total of 232 transactions, in calculating the balance in the account at the end of that period because "there simply is no explanation for what [these] transactions mean." *Id.* ¶ 18(d). G&D instead argues that the Court should total only the 24 "authorized" deposits and withdrawals on the Master Account statements that, absent the garnishment, would yield a balance of $120,725.51 at the end of April 2013. *Id.* ¶ 3. Under this theory, when SunTrust issued a check to withdraw $133,656.69 from the Master Account to answer the garnishment summons, it could only have withdrawn $120,725.51 in funds belonging to G&D. Then, when the Virginia court granted a motion to quash and the garnishment and returned the $133,656.69, but SunTrust returned only $49,157.69 of that amount to G&D,

SunTrust improperly failed to return $71,567.92, the difference between $120,725.51 and $49,157.59.[1]

G&D's proposed analysis reflects its frustration with the way SunTrust placed holds on the ZBA accounts. By placing a hold on any withdrawals but not on deposits while failing to sever the ZBA accounts from one another, SunTrust set off an exceedingly complicated cycle of transfers between the accounts. SunTrust does not dispute that its approach was improper and made it extremely difficult to discern the true balance in the account. During an evidentiary hearing in the garnishment proceedings, SunTrust Vice President Andrew Dolson personally apologized to the Virginia Court for failing to sever the accounts upon placing the holds, explaining that this error "did bad, bad things in terms of echoing these illusory dollars back and forth." Joint Record ("J.R.") 167, 178, ECF No. 116. Taken together with the fact that the Virginia Supreme Court ultimately ruled that no funds should have been garnished from the Master Account in the first place, *see PS Business, L.P. v. Deutsch & Gilden, Inc.*, 758 S.E.2d 508, 514 (Va. 2014), G&D's frustration with SunTrust and its treatment of the accounts in the ZBA relationship is warranted. However, G&D's proposed response to SunTrust's errors—that the Court should completely ignore the ZBA relationship and all automatic ZBA transactions with the Subsidiary Accounts in its review of the Master Account statements—is neither warranted nor grounded in the evidence, as it turns a blind eye to the actual flow of funds into and out of the related accounts.

---

[1] Although the briefs and affidavits filed with the Motions use slightly different figures at various times, apparently inadvertently, the garnishment check was actually in the amount of $133,656.69, and the check from SunTrust to G&D returning a portion of those funds was in the amount of $49,151.69. The Court will use these figures, which are reflected in the exhibits showing the actual checks or containing contemporaneous communications between the parties about the actual checks. *See* Joint Record ("J.R.") 473, 549, ECF No. 116.

The Master Account statements cannot be viewed in isolation because the balance of the Master Account depended directly on the balances of the Subsidiary Accounts in the ZBA relationship. The Master Account's balance was in a constant state of flux as money flowed in and out of the Subsidiary Accounts, and, in turn, money flowed in and out of the Master Account to create a zero balance in each of the Subsidiary Accounts at the end of each business day. The fact that the regularity of these transactions was disrupted by the garnishment holds does not mean that the irregular transactions can be ignored. Although G&D argues that these ZBA transactions were not authorized, G&D separately admits that it authorized SunTrust to move funds between the accounts pursuant to the ZBA relationship.

Thus, G&D offers no method for deciphering the account statements of March and April 2013 that is supported by the evidence. Instead, it effectively argues that the Court should, as a matter of equity, treat the Master Account as an isolated account with no relationship to its Subsidiary Accounts, which is factually inaccurate. Notably, Fooksman admitted during his deposition that any accurate analysis of the Master Account's balance during the relevant time period must take into account the ZBA transactions, and that his analysis failed to do so. J.R. 513-14. Accordingly, the Court cannot credit G&D's analysis of the Master Account statements and its ultimate conclusion that G&D is owed $71,567.92. G&D's Motion for Summary Judgment will be denied.

### III. SunTrust's Motion

SunTrust argues that although the placing of garnishment holds disrupted the normal functioning of the ZBA accounts, it has now accounted for every transaction listed on the account statements during the relevant time period and that, despite the confusing way in which the ZBA transfers played out as a result of the holds, by the end of April 2013 when the holds were

rescinded, the Master Account statement was accurate, and the Master Account had an overdrawn balance of –$84,505.

SunTrust's explanation of the functioning of the accounts during the period of the garnishment holds is provided through a 25-page affidavit by SunTrust First Vice President Michael P. Kelley, a certified fraud examiner, supported by nearly 250 pages of records. In his affidavit, Kelley explained how the ZBA service functioned in the absence of any holds, as described above. He then provided a detailed explanation of what happened when holds were placed on some of the accounts in the ZBA relationship in a manner which allowed credits, but not debits, to be posted to the accounts. Effectively, these holds resulted in a cycle where, at the end of each business day, when a Subsidiary Account had a positive balance, and funds in that amount were supposed to flow to the Master Account to create a zero balance in the Subsidiary Account, a credit in the amount of that balance would post to the Master Account reflecting such a transfer into the Master Account. However, because the hold barred any outflows from the Subsidiary Account, the corresponding debit to the Subsidiary Account would be rejected by the system. To adjust for this imbalance, SunTrust personnel manually entered the debit to the Subsidiary Account, but it would post on the following business day.

The reverse occurred when a Subsidiary Account had a negative balance at the end of the day. Although under the ZBA arrangement, funds were supposed to flow from the Master Account into the Subsidiary Account to bring the Subsidiary Account's balance up to zero, and a credit did, in fact, post on the Subsidiary Account's statement, the hold on the Master Account would not permit a corresponding debit to post on the Master Account's statement. The manual posting of the corresponding debit to the Master Account occurred the following business day. Thus, during the period while the holds were in place, the debit side of the ZBA transactions lagged one day

behind the credit side of the transactions. As a result, the system was continuously trying to correct the apparent imbalance created by the lag, which was reflected in the form of credits appearing on the Master Account each day, and corresponding, manually-posted debits to the Master Account appearing the next day.

Specifically, as a result of this course of activity, the Master Account had an apparent balance of $133,915.51 at the end of the day on April 5, 2013. This figure was inaccurate because at that time, and when the $133,656.69 garnishment check was posted on Monday, April 8, three credits reflecting ZBA transfers from the Master Account had already posted to a Subsidiary Account, but the corresponding debits had not yet been manually posted to the Master Account. Once those debits were manually posted a day after the credits, they would reveal that the listed balance of the Master Account at the time of the garnishment withdrawal was artificially high, such that the garnishment check effectively removed more funds than were actually available in the account.

SunTrust's submitted records corroborate this explanation. SunTrust has submitted statements for the Master Account and all Subsidiary Accounts from March and April 2013 with every single transaction labeled with a line number. Every line number corresponds to a line in a spreadsheet created by Kelley, which tracks the flow of funds between the accounts during the relevant time period. The bank statements and spreadsheet reflect that three credit entries were entered on Subsidiary Accounts on April 5, but the corresponding, manually-entered debit entries appeared in the Master Account on April 8, the following business day, in lines 288-290 of the spreadsheet. Likewise, another three credit entries appeared in the Subsidiary Accounts on April 8, with the corresponding debit entries entered in the Master Account on April 9, in lines 292-294 of the spreadsheet.

A detailed review of the bank statements and spreadsheet reveals that ultimately, every manual ZBA debit transaction corresponded to an equivalent credit transaction, such that although the daily account balances were inaccurate while the holds were in place, and remained inaccurate on subsequent days because of the ongoing lag between credits and debits, they ultimately were corrected on April 23, 2013, when the holds were removed and two sets of debits were entered that day: (1) a set that was manually posted to offset credits from April 22, when the holds had been in effect, and (2) a second set automatically entered pursuant to the standard ZBA process to offset credits posted on April 23, the same day.

Collectively, the submitted records, along with Kelley's explanation, demonstrate that the ending balance of –$84,505 in the Master Account at the end of April 2013, reflected on the Master Account statement sent to G&D, accurately reflected the amount of funds in the account, even though on April 5, 2013 it had appeared that the account held over $133,000 in funds. At the hearing on the Motions, G&D clarified that it never reimbursed SunTrust for the negative balance of –$84,505, and that it terminated its banking relationship with SunTrust shortly after the holds were removed such that no other funds deposited into the Master Account or any Subsidiary Account offset any portion of that amount. Thus, as Kelley has asserted, when the $133,656.69 in improperly garnished funds from the Master Account were returned to SunTrust from the Virginia Court, "SunTrust should have used $84,505 of those funds to cover the negative balance in Account 61663 and returned the remaining $49,151.[6]9—the difference between the $133,656.[6]9 debited and the overdraft amount of $84,505—in funds to the owner of Account 61663." Kelley Aff. ¶ 94, ECF No. 103-2. SunTrust effectively did credit to G&D the full $133,656.69 by using $84,505 to eliminate the negative balance—funds it inadvertently fronted to the Virginia Court on behalf of G&D—and writing a check to G&D for $49,151.69.

Thus, where SunTrust has submitted a comprehensive analysis of the account statements for March and April 2013, supported by evidence, to establish that the ending balance of the Master Account was accurate, and G&D has failed to submit any competing explanation that takes into account the ZBA transfers authorized by G&D and acknowledged by its own expert as relevant to the Court's analysis, the Court finds that SunTrust has shown that there is no genuine dispute of material fact that it returned the proper amount of garnished funds to G&D and owes no further debt to G&D stemming from the garnishment proceeding. Accordingly, SunTrust is entitled to judgment as a matter of law on G&D's breach of contract claim stemming from SunTrust's alleged failure to return the full amount of garnished funds.

## CONCLUSION

For the foregoing reasons, G&D's Motion for Summary Judgment is DENIED, and SunTrust's Motion for Summary Judgment is GRANTED. A separate Order shall issue.

Date: March 28, 2019

THEODORE D. CHUANG
United States District Judge